# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

---

**J D. HOOPER,**

**Plaintiff,**

**v.**

**JOHN KEVIN STITT, Governor,**
**State of Oklahoma,**

**Defendant.**

---

## CIVIL COMPLAINT SEEKING DECLARATORY JUDGMENT AND REQUEST FOR INJUNCTIVE RELIEF

---

**DEBRA K. HAMPTON, OBA # 13621**
Hampton Law Office, PLLC
3126 S. Blvd., # 304
Edmond, OK 73013
Tel:(405) 250-0966
Fax:(866) 251-4898
hamptonlaw@cox.net
Attorney for Plaintiff

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iv

CASES ................................................................................................................... iv

STATUTES ............................................................................................................. vi

OTHER AUTHORITIES ........................................................................................ vi

TREATISES ........................................................................................................... vii

REGULATIONS ..................................................................................................... vii

CONSTITUTIONAL PROVISIONS ..................................................................... vii

JURISDICTION AND VENUE .............................................................................. 1

INTRODUCTORY STATEMENT ......................................................................... 2

FACTUAL BASIS FOR CLAIM ........................................................................... 3

    I.    How did Oklahoma obtain Sovereign Authority over Indian Country at the time of admission into the Union when the treaty rights of the Tribes could not be infringed upon as it destroyed their right to Tribal self-governance? ............................................................................................ 5

        A.    The land patent that was issued to the Cherokee Nation on December 31, 1838, has never been withdrawn by Congress and still applies with full force. ............................................................................... 5

        B.    Congressional Acts ....................................................................... 8

        C.    Federal lawsuit filed in the Western District of Oklahoma finding a Federal Preemption ................................................................ 13

        D.    Oklahoma cannot assert Sovereign Authority as Congressional intent is clear considering Oklahoma's own interpretation of Federal law ........... 15

        E.    The United States Supreme Court's interpretation of Oklahoma's Enabling Act ................................................................................. 15

        F.    Primacy of Federal Interest ....................................................... 16

i.  Oklahoma's Administrative Surface Mining Control and Reclamation is preempted by Federal Law and Oklahoma Administrative Code. ........................................................... 17

ii.  Medical Marijuana Licenses are preempted by Federal Law and Oklahoma Administrative Code. ............................................. 17

iii.  Oklahoma Tax Commission's rules preempt authority to impose taxes in Indian Country because that is derived from Federal Law and Oklahoma Administrative Code. ............................................................. 17

G.  *Oklahoma v. Castro-Huerta*, 142 S.Ct. 2486 (2022) does not vest Oklahoma with authority................................................................. 19

H.  An analysis under *Heck v. Humphrey*, supports that Plaintiff's claims cannot be barred. ........................................................................ 22

STANDARDS FOR GRANTING PRELIMINARY INJUNCTIONS ............................ 23

EXHAUSTION OF REMEDIES. ..................................................................... 25

RELIEF SOUGHT ......................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**

*Antoine v. Washington*, 420 U.S. 194 (1975) ...................................................... 10

*Brewer-Elliott Oil & Gas Co. v. U.S.*, 260 U.S. 77 (1922) ................................... 7

*Burck v. Taylor*, 152 U.S. 634 (1894) ............................................................... 22

*Cherokee Nation v. Hitchcock*, 187 U.S. 294 (1902) ........................................... 6

*Cherokee Nation v. Journeycake*, 155 U.S. 196, 207 (1894) ............................... 6

*City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005) .......... 18

*Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540, 548 (1902) ........................... 22

*County of Yakima v. Confederated Tribes and Bands of Yakima Nation*,
    502 U.S. 251, 258 (1992) .................................................................... 18

*Currey v. Corporation Comm'n*,
    1979 OK 89, 617 P.2d 177, 179-80, *cert. denied*, 452 U.S. 938 (1981) ...................... 16

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
    356 F.3d 1256, 1261 (10th Cir. 2004) .................................................... 23

*Draper v. U.S.,* 164 U.S. 240 (1896) .................................................................. 15

*Ewert v. Bluejacket*, 259 U.S. 129, 138 (1922) ................................................. 22

*Ex parte Webb*, 225 U.S. 663, 682 (1912) ......................................................... 20

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) ..................... 14

*Heck v. Humphrey*, 512 U.S. 477, 478 (1994) ................................................... 22

*Herrera v. Wyoming*, 587 U.S. __, 139 S.Ct. 1686 (2019) ............................... 11

*Higgins v. Brown*, 1908 OK 28, ¶ 164, 20 Okla. 355, 94 P. 703 ...................... 15

*Hogner v. State*, 2021 OK CR 4, 500 P.3d 629 ................................................. 13

*In re Initiative Petition No*. 363, 1996 OK 122, 927 P.2d 558, 563 & n. 12 .................... 14

*In re James*, 940 F.2d 46, 53 (3rd Cir. 1991) ..................................................... 21

*Indian Country, U.S.A. v. Oklahoma Tax Com'n*,
   829 F.2d 967 (10th Cir. 1987) *cert. denied*, 487 U.S. 1218 (1988) .............................. 15

*Lac Courte Oreilles Band of Lake Superior Chippewa*
   *Indians of Wisconsin v. Evers*, 46 F.4th 552 (7th Cir. 2022) .......................................... 12

*McGirt v. Oklahoma*, 591 U.S. ____, 140 S.Ct. 2452 (2020) ................................................. 3

*Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973) ........................................... 18

*Miller v. Ammon*, 145 U.S. 421, 426 (1892) ...................................................................... 22

*Murphy v. Royal*, 866 F.3d 1164 (10th Cir. 2017) ............................................................. 23

*Neasbitt v. Hon. Wallace Coppedge*, Case No. PR-2021-1478 .......................................... 4

*New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333-335 (1983) ......................... 19

*O Centro Espirita Beneficiente v. Ashcroft*, 389 F.3d 973, 1012 (10th Cir. 2004) ........... 24

*Oklahoma Tax Comm'n v. Sac and Fox Nation,* 508 U.S. 114, 128 (1993) ..................... 18

*Oklahoma v. Castro-Huerta,* 142 S.Ct. 2486 (2022) ........................................ 8, 16, 19, 21

*Oklahoma v. United States Department of Interior, et. al.*,
   Case No. CIV-21-719-F ........................................................................................... 13, 18

*Organized Village of Kake v. Egan*, 369 U.S. 60, 69 (1961) ............................................ 16

*Republican Party of New Mexico v. King,* 741 F.3d 1089, 1092 (10th Cir. 2013) ........... 23

*Rogers Cnty. Bd. of Tax Roll Corr. v. Video Gaming Techs*., 141 S.Ct. 24 (2020) .......... 18

*SCFC ILC, Inc. v. Visa USA*, Inc., 936 F.2d 1096, 1098-99 (10th Cir. 1991) .................. 24

*Seneca-Cayuga Tribe v. State ex rel. Thompson*, 874 F.2d 709 (10th Cir. 1989) ............. 16

*Sizemore v. State*, 2021 OK CR 6, 485 P.3d 867 .............................................................. 13

*State ex rel. Matloff v. Wallace*, 2021 OK CR 21, 497 P.3d 686 ........................................ 4

*State ex rel. Smith v. Neuwirth*, 2014 OK CR 16, ¶ 11, 337 P.3d 763, 765-766 ................ 3

*U.S. v. Champlin Refining Co.*, 156 F.2d 769 (10th Cir. 1946) ........................................... 7

*U.S. v. Langford,* 641 F.3d 1195, 1197, fn. 1 (10th Cir. 2011) ........................................... 5

*U.S. v. McBratney,* 104 U.S. 621 (1882) ........................................................ 15

*United States ex rel. Citizen Band Potawatomi Indian*
   *Tribe v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888 (10th Cir. 1989) .............. 23

*Video Gaming Techs., Inc. v. Rogers Cnty. Bd. of Tax Roll Corr.,*
   2019 OK 83, 475 P.3d 824, 834 ................................................................ 18

*Ware v. Hylton*, 3 U.S. 199 (1796) ............................................................ 20

*Warner v. Gross,* 776 F.3d 721, 736 (10th Cir. 2015) ........................................ 24

*Waskey v. Hammer*, 223 U.S. 85, 94 (1912) .................................................... 22

*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980). .................................. 19

*Woodward v. U.S. Bank National Assoc.,*
   Bankruptcy No. 17-16163-MDC (Bankr. E.D. Pa. July 21, 2020) ............................... 21

## STATUTES

18 U.S.C. § 1151 .............................................................................. 14
25 U.S.C. § 5101 .............................................................................. 10
25 U.S.C. § 5118 .............................................................................. 10
25 U.S.C. § 5128 .......................................................................... 10, 11
28 U.S.C. § 1331 ............................................................................... 1
28 U.S.C. § 2201 ........................................................................... 1, 13
28 U.S.C. § 2254 .............................................................................. 22
30 U.S.C. § 1201 .............................................................................. 13
42 U.S.C. § 1983 .......................................................................... 1, 22

## OTHER AUTHORITIES

3 E. Washburn, American Law of Real Property *521-*524 ........................................ 8
Enabling Act Amendment, ch. 2911, 34 Stat. 1286 (1907) ....................................... 15
Enabling Act, ch. 3335, § 3, 34 Stat. 267, 270 (1906) ........................................ 15
June 15, 1935, ch. 260, §4, 49 Stat. 378 ..................................................... 10
June 25, 1948, ch. 645, 62 Stat. 757 .......................................................... 6
May 24, 1949, ch. 139, § 25, 63 Stat. 94 ...................................................... 6

**TREATISES**

1833 Treaty with the Western Cherokee, February 14, 1833, 7 Stat. 414 ......................... 8

1835 Treaty with the Cherokee, December 29, 1835, 7 Stat. 478,.................................... 9

1866 Treaty with the Cherokee, July 19, 1866, 14 Stat. 799 ............................................ 9

**REGULATIONS**

Okla. Admin. Code 310:681-1-3 ..................................................................................... 17

Okla. Admin. Code 460:20-3-5 ...................................................................................... 17

Okla. Admin. Code 710:50-15-2 ..................................................................................... 17

**CONSTITUTIONAL PROVISIONS**

Okla. Const. art. I § 3 .................................................................................................... 14

U.S. Const. art. I, § 8, cl. 3 ............................................................................................ 16

U.S. Const. art. VI, cl. 2 ..................................................................................... 12, 16, 20

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) | J D. HOOPER, | ) |
| | Plaintiff, | ) |
| | | ) |
| v. | | ) |
| | | ) |
| (1) | JOHN KEVIN STITT, Governor, | ) |
| | State of Oklahoma, | ) |
| | Defendant. | ) |

## CIVIL COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

COMES NOW, the Plaintiff, J D. HOOPER, through his attorney Debra K. Hampton and submits this as Plaintiff's Civil Rights Complaint under 42 U.S.C. § 1983. In support of it, Plaintiff states:

### PARTIES

**PLAINFIFF**

1.    **Plaintiff:**    **J D. HOOPER**, a Native American and United States citizen seeks relief in this court because his rights have been violated under treaties and in violation of an Act of Congress.

**DEFENDANT**

1.    **Defendant:   JOHN KEVIN STITT**, Governor, State of Oklahoma in his official capacity is an arm of the State when the current allegations arose. The Defendant is a resident of the State of Oklahoma.

### JURISDICTION AND VENUE

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States under 28 U.S.C. § 1331. A

1

declaratory judgment may also be sought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*. Further, these claims may be brought under 42 U.S.C. § 1983 which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, **any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws**, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Venue is proper in this Court because the Defendant lives within the jurisdiction of this Court.

## INTRODUCTORY STATEMENT

Plaintiff was tried by jury in the District Court of Adair County, Case No. CF-2012-100, and convicted of three counts of First-Degree Rape (victim under age 14) (Counts 1-3), in violation of 21 O.S. §1114 (A)(1) (2008), and three counts of Sodomy (victim under age 16) (Counts 4-6), in violation of 21 O.S. § 886 and 21 O.S. §888 (2007). Count 7 (Child Abuse by Injury) was dismissed during trial when the trial court sustained Hooper's demurrer to that count. Plaintiff timely appealed to the Oklahoma Court of Criminal Appeals (OCCA) with the judgment being affirmed.

Adair County Oklahoma is within the jurisdiction of the Cherokee Nation where Oklahoma cannot exercise authority because it lacks Sovereign Authority to make laws

that affect the Cherokee Nation. Plaintiff then sought post-conviction relief with the State District Court granting post-conviction relief because of the decision in *McGirt v. Oklahoma*, 591 U.S. ____, 140 S.Ct. 2452 (2020) and dismissed the action on March 17, 2021, because the Court found that it had no jurisdiction or Sovereign Authority.

Plaintiff was then indicted by the United States of America on March 16, 2021, in *United States v. Hooper,* (6:21-cr-00066). On June 1, 2022, upon the Government's Motion to Dismiss (Doc. 62) filed on May 27, 2022, the Eastern District of Oklahoma dismissed the action without prejudice. (Doc. 63) The Court noted that the Plaintiff had been charged in Cherokee Nation Court and will be held on those charges. *Id.* Plaintiff has been transferred back to the Oklahoma Department of Corrections.

## FACTUAL BASIS FOR CLAIM

Oklahoma vacated and dismissed the action against Plaintiff thus losing jurisdiction over his custody. Months after Plaintiff was granted post-conviction relief Oklahoma moved to vacate the previous Order granting of post-conviction relief seeking to reimpose the sentence previously vacated and dismissed which the State district court found that it had the authority to do so. Plaintiff is in the custody of the Cherokee Nation and has remained in its custody since the United States dismissed the indictment against him. Plaintiff claims that once Oklahoma dismissed the action against him that jeopardy also attached but moreover, Oklahoma could not reimpose a sentence on Plaintiff because it lacks the authority to do so.

Oklahoma law would allow for either party to appeal a grant of post-conviction relief under 22 O.S. § 1087 which this also applies to Oklahoma because an Order granting

3

post-conviction relief is a final order and failing to appeal is fatal. *State ex rel. Smith v. Neuwirth*, 2014 OK CR 16, ¶ 11, 337 P.3d 763, 765-766. Section 1087 provides:

> A final judgment entered under this act may be appealed to the Court of Criminal Appeals on petition in error filed either by the applicant or the state within thirty (30) days from the entry of the judgment. Upon motion of either party on filing of notice of intent to appeal, within ten (10) days of entering the judgment, the district court may stay the execution of the judgment pending disposition on appeal; provided, the Court of Criminal Appeals may direct the vacation of the order staying the execution prior to final disposition of the appeal.

The issue here is bigger because Oklahoma already determined it lacked jurisdiction. *See Neasbitt v. Hon. Wallace Coppedge*, Case No. PR-2021-1478 issued by the Oklahoma Court of Criminal Appeals (Rowland P.J dissenting) noting the Court (no longer had jurisdiction when he vacated his original order granting post-conviction relief since the State did not timely appeal it, making the order final and unalterable…) *Id.* ([T]he District court's jurisdiction over this post-conviction appeal had come to an end, whether we like the result or not.) *Id* dissent at 5. Judge Lumpkin also dissented in *Neasbitt* stating:

> The record shows that on March 24, 2021, Judge Coppedge entered a valid order granting Petitioner post-conviction relief based upon the extant law at that time, *McGirt* and this Court's then interpretation of *McGirt* contained in *Bosse*. Although the State had the right to appeal the order within thirty days from its entry, the State chose not to do so and the order became final. This failure to appeal was the first mistake in the course of this litigation.

No justice in the OCCA followed the State procedural due process in *See State ex rel. Matloff v. Wallace*, 2021 OK CR 21, 497 P.3d 686 considering *Matloff's* failure to appeal a final order but instead sought a writ of prohibition when he had forfeited his appeal rights. But more interestingly in *Matloff*, the assistant district attorney never filed a response in the district court and *Matloff's* claims were estopped.

4

**I.      HOW DID OKLAHOMA OBTAIN SOVEREIGN AUTHORITY OVER INDIAN COUNTRY AT THE TIME OF ADMISSION INTO THE UNION WHEN THE TREATY RIGHTS OF THE TRIBES COULD NOT BE INFRINGED UPON AS IT DESTROYED THEIR RIGHT TO TRIBAL SELF-GOVERNANCE?**

## ARGUMENT AND AUTHORITY

The question in this case is how Oklahoma established sovereign authority over Indian Country because Oklahoma disclaimed authority over that land upon their admission into the Union. The Tenth Circuit has stated "[w]hen we speak of jurisdiction, we mean sovereign authority, not subject-matter jurisdiction." *See U.S. v. Langford,* 641 F.3d 1195, 1197, fn. 1 (10th Cir. 2011). Oklahoma has no authority to enforce State statutes on the Cherokee Nation, "[n]or has Congress ever passed a law conferring jurisdiction on Oklahoma." *McGirt,* 140 S.Ct. at 2478.

**A.      The land patent that was issued to the Cherokee Nation on December 31, 1838, has never been withdrawn by Congress and still applies with full force.**

First to show that the Cherokee Nation has not been disestablished and that Oklahoma could not assert authority over land which will aid this Court in declaratory judgment. The Cherokee Nation was created under the Treaty of New Echota signed on December 29, 1835, in New Echota, Georgia. The Treaty established terms for the Cherokee Nation to cede its territory in the southeast and move west to the Indian Territory. This Treaty was amended and ratified in March 1836 and became the legal basis for the forcible removal known as the Trail of Tears. *See McGirt* at 2458 recognizing there was a promise on the Trail of Tears to the Muskogee Nation, but that promise was also extended

to the Cherokee Nation. *Id.*

On December 31, 1838, a land patent was issued where it conveyed to the Cherokee Nation the lands secured and guaranteed by the treaties of 1828, 1833, and 1835. Pursuant to 18 U.S.C. § 1151 which defines Indian country it anticipates land patents.[1] In *Cherokee Nation v. Journeycake*, 155 U.S. 196, 207 (1894), the Court addressed the treaties and the 1838 patent the Court held: "Under these treaties, and in December 1838, a patent was issued to the Cherokees for these lands. By that patent, whatever of title was conveyed, was conveyed to the Cherokees as a nation, and no title was vested in severalty in the Cherokees, or any of them." *Cherokee Nation v. Hitchcock*, 187 U.S. 294 (1902). By subsequent treaties of February 14, 1833, 7 Stat. 414, and December 29, 1835, 7 Stat. 478, certain changes were made in the boundaries of the reservation and the outlet, and by article 3 of the latter treaty it was provided that "the United States also agree that the lands above ceded by the treaty of February 14, 1833, including the outlet, and those ceded by this treaty shall all be included in one patent executed to the Cherokee Nation of Indians by the President of the United States according to the provisions of the act of May 28, 1830." *Cherokee Nation v. Journeycake*, *supra.* This patent would have to be withdrawn by

---

[1] Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, **notwithstanding the issuance of any patent,** and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
(June 25, 1948, ch. 645, 62 Stat. 757; May 24, 1949, ch. 139, § 25, 63 Stat. 94.)

Congress that never happened. "If Congress wishes to break the promise of a reservation, it must say so." *McGirt* 140 S.Ct. at 2462.

The land patent issued to the Cherokee Nation which preserved the Indian Country status of the reservation and was issued prior to Oklahoma asserting authority over the land which Oklahoma could not destroy a title already occurred under federal law. In *Brewer-Elliott Oil & Gas Co. v. U.S.*, 260 U.S. 77 (1922) the Court held:

> The question here is what title, if any, the Osages took in the riverbed in 1872 when this grant was made, and that was thirty-five years before Oklahoma was taken into the Union and before there were any local tribunals to decide any such questions. The title of the Indians grows out of a **federal grant when the Federal Government had complete sovereignty over the territory in question.** Oklahoma when she came into the Union, took sovereignty over the public lands in the condition of ownership as they were then, and, if the bed of a non-navigable stream had then become the Property of the Osages, there was nothing in the admission of Oklahoma into a constitutional equality of power with other States which required or permitted a divesting of the title. It is not for a State by courts or legislature, in dealing with the general subject of beds of streams, to adopt a retroactive rule for determining navigability which would destroy a title already accrued under federal law and grant or would enlarge what actually passed to the State, at the time of her admission, under the constitutional rule of equality here invoked.

*Id.* at 87-88 (emphasis added). *See also U.S. v. Champlin Refining Co.*, 156 F.2d 769 (10th Cir. 1946). The same applies here because Oklahoma could not divest the title and there was nothing that allowed Oklahoma to assert authority over the Indian Country. Looking at what Justice Gorsuch said in *McGirt*, addressing land patents issued to the homesteaders the Court held:

> [I]t isn't so hard to see why. The Federal Government issued its own land patents to many homesteaders throughout the West. These patents transferred legal title and are the basis for much of the private land ownership in a number of states today. But no one thinks any of this diminished the United

7

States' claim to sovereignty over any land. To accomplish that would require an act of cession, the transfer of a sovereign claim from one nation to another. 3 E. Washburn, American Law of Real Property *521-*524. And there is no reason why Congress cannot reserve land for tribes in much the same way, allowing them to continue to exercise governmental functions over land even if they no longer own it communally. Indeed, such an arrangement seems to be contemplated by 18 U.S.C. § 1151(a)'s plain terms.

*McGirt, supra*, at 2464.

In the formation of Oklahoma, Congress did not have the authority to allow Oklahoma to control the Cherokee Nation reservation because it could not give that land to Oklahoma because it was already promised through the patent. There must have been a cession of the land, a transfer from one sovereign to another and because the land belonged to the Cherokee Nation, they would have had to cede the land to Oklahoma or back to the United States. Oklahoma has slandered titles to land and imposed regulations of the Cherokee reservation when it lacked sovereign authority to do so.

### B.    Congressional Acts

The following Treaties and Congressional acts unequivocally implicate and present such federal preemptions as contemplated in *Oklahoma v. Castro-Huerta,* 142 S. Ct. 2486 (2022), thus preempting State jurisdiction on treaty lands:

**1833 Treaty with the Western Cherokee**, February 14, 1833, 7 Stat. 414, Proclamation, April 12, 1834 (emphasis added):

> ARTICLE 1. The United States agree to possess the Cherokees, and **to guarantee it to them forever**, and that guarantee, is hereby pledged, of seven millions of acres of land, to be bounded as follows viz….
> ARTICLE 7. **This treaty, or articles of convention, after the same have been ratified, by the President and Senate shall be underline obligatory on the United States and said Cherokee nation**.

**1835 Treaty with the Cherokee**, December 29, 1835, 7 Stat. 478, Proclamation,

May 23, 1836 (emphasis added):

> ARTICLE 2. Whereas by the treaty of May 6th, 1828, and the supplementary treaty thereto of Feb. 14th, 1833, with the Cherokees west of the Mississippi **the United States guarantied and secured to be conveyed by patent**, to the Cherokee nation of Indians the following tract of country….

> ARTICLE 3. The United States also agree that the lands above ceded by the treaty of Feb. 14, 1833, including the outlet, and those ceded by this treaty shall all be **included in one patent executed to the Cherokee nation of Indians by the President of the United States according to the provisions of the act of May 28 1830**….

> ARTICLE 5. **The United States hereby covenant and agree that the lands ceded to the Cherokee nation in the forgoing article shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory**. But they shall secure to the Cherokee nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them: provided always that they shall not be inconsistent with the constitution of the United States and such acts of Congress as have been or may be passed regulating trade and intercourse with the Indians; and also, that they shall not be considered as extending to such citizens and army of the United States as may travel or reside in the Indian country by permission according to the laws and regulations established by the Government of the same….

> ARTICLE 19. This treaty after the same shall be ratified by the President and Senate of the United States **shall be <u>obligatory</u> on the contracting parties**.

**1866 Treaty with the Cherokee**, July 19, 1866, 14 Stat. 799, Ratified July 27, 1866,

Proclaimed August 11, 1866 (emphasis added):

> ARTICLE 31. **All provisions of treaties heretofore ratified and in force, and not inconsistent with the provisions of this treaty, are hereby re-affirmed and declared to be in full force**; and nothing herein shall be construed as an acknowledgment by the United States, or as a relinquishment by the Cherokee Nation of any claims or demands under the guarantees of former treaties, except as herein expressly provided.

In 1934, Congress passed the Indian Reorganization Act, codified as 25 U.S.C. §§ 5101, etc. seq.; 25 U.S.C. § 5128, provides "All laws, general and special, and all treaty provisions affecting any Indian reservation which has voted or may vote to exclude itself from the application of the Act of June 18, 1934 (48 Stat. 984) [25 U.S.C. § 5101 et seq.], shall be deemed to have been continuously effective as to such reservation, notwithstanding the passage of said Act of June 18, 1934. **Nothing in the Act of June 18, 1934, shall be construed to abrogate or impair any rights guaranteed under any existing treaty with any Indian tribe, where such tribe voted not to exclude itself from the application of said Act**." (June 15, 1935, ch. 260, §4, 49 Stat. 378) (emphasis added).[2]

Thereafter in 1988, Congress enacted Public Law 100–647, thereby amending 25 U.S.C. § 71 (R.S. § 2079; Pub. L. 100–647, title III, § 3042, Nov. 10, 1988, 102 Stat. 3641), which in pertinent part provides, "[N]o obligation of any treaty [such as the foregoing Treaties of 1833, 1835 and 1866 with the Cherokee] lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired."[3] Congressional intent is clearly expressed by language that "no obligation" of

---

[2] The 1934 Indian Reorganization Act ("IRA") officially ended the allotment era for all tribes. Act of June 18, 1934, ch. 576, 48 Stat. 984 (codified at 25 U.S.C. §§ 5101, etc. seq.). The IRA excluded Oklahoma tribes from applicability of five IRA sections, 25 U.S.C. § 5118, but all other IRA sections applied to Oklahoma tribes, including provisions ending allotment.

[3] *Cf. Antoine v. Washington*, 420 U.S. 194 (1975), "The Act of Mar. 3, 1871, 16 Stat. 544, 566, now codified as 25 U.S.C. § 71, provides: 'No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be invalidated or impaired.'" *Id.*, at 202, n. 8. In 1988,

the Treaties with the Cherokee "shall be hereby invalidated or impaired" under 25 U.S.C.

§ 71, and in conjunction with 25 U.S.C. § 5128, *supra*. The Cherokee Nation was promised

that it "shall, in no future time without their [the Cherokee Nation] consent, be included

within the territorial limits or jurisdiction of any State or Territory" *Id.,* 7 Stat. 478, at

Article 5, the State of Oklahoma could never have acquired sovereign authority over the

lands, thus the State has no form of jurisdiction.

In *Herrera v. Wyoming*, 587 U.S. __, 139 S.Ct. 1686 (2019), the Court dealt with

Wyoming's Statehood Act, and whether it abrogated Treaty provisions:

> We first consider whether the Crow Tribe's hunting rights under the 1868
> Treaty remain valid. Relying on this Court's decision in *Mille Lacs*, Herrera
> and the United States contend that those rights did not expire when Wyoming
> became a State in 1890. We agree.... First, the Wyoming Statehood Act does
> not show that Congress intended to end the 1868 Treaty hunting right. **If
> Congress seeks to abrogate treaty rights, "it must clearly express its
> intent to do so**." *Mille Lacs*, 526 U.S. at 202, 119 S.Ct. 1187. "**There must
> be `clear evidence that Congress actually considered the conflict between
> its intended action on the one hand and Indian treaty rights on the other,
> and chose to resolve that conflict by abrogating the treaty**.'" *Id*., at 202-
> 203, 119 S.Ct. 1187 (quoting *Dion*, 476 U.S. at 740, 106 S.Ct. 2216); see
> *Menominee Tribe*, 391 U.S. at 412, 88 S.Ct. 1705. Like the Act discussed in
> *Mille Lacs*, the Wyoming Statehood Act "makes no mention of Indian treaty
> rights" and "provides no clue that Congress considered the reserved rights of

---

Congress passed "The Technical and Miscellaneous Revenue Act of 1988 (Public Law
100-647)," which amended 25 U.S.C. § 71. As amended, the full text of 25 U.S.C. § 71,
reads as follows: "No Indian nation or tribe within the territory of the United States shall
be acknowledged or recognized as an independent nation, tribe, or power with whom the
United States may contract by treaty; **but no obligation of any treaty lawfully made and
ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby
invalidated or impaired.** Such treaties, and any Executive orders and Acts of Congress
under which the rights of any Indian tribe to fish are secured, shall be construed to prohibit
(in addition to any other prohibition) the imposition under any law of a State or political
subdivision thereof of any tax on any income derived from the exercise of rights to fish
secured by such treaty, Executive order, or Act of Congress if section 7873 of Title 26 does
not permit a like Federal tax to be imposed on such income." (Emphasis added).

the [Crow Tribe] and decided to abrogate those rights when it passed the Act." *Cf. Mille Lacs*, 526 U.S. at 203, 119 S.Ct. 1187; see Wyoming Statehood Act, 26 Stat. 222. There simply is no evidence that Congress intended to abrogate the 1868 Treaty right through the Wyoming Statehood Act, much less the "`clear evidence'" this Court's precedent requires. *Mille Lacs*, 526 U.S. at 203, 119 S.Ct. 1187.

*Id.*, at 1694, 1698-1699 (emphasis added).

Next, more recently in *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. Evers*, 46 F.4th 552 (7th Cir. 2022) the Seventh Circuit undertook an analysis of 25 U.S.C. § 71, as it pertains to Treaty obligations:

But even as Congress in 1871 carved a bigger role for itself going forward, it took care to emphasize that existing Indian treaties retained full effect—at least until further notice. See 25 U.S.C. § 71 (providing that "no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired"). Unless Congress expressly says otherwise, then, an Indian treaty remains the "supreme Law of the Land." *McGirt*, 140 S.Ct., at 2462 (quoting U.S. Const. art. VI, cl. 2) …. **To this point, we have said little about the document that created and that lies in the background of this case—the Treaty of La Pointe. Everyone agrees that, since Congress has never said otherwise, that Treaty remains the "supreme Law of the Land." *McGirt*, 140 S.Ct., at 2462 (quoting U.S. Const. art. VI, cl. 2); *see also* 25 U.S.C. § 71 (affirming the continued validity of "any treaty lawfully made and ratified with any … Indian nation or tribe prior to March 3, 1871")**. And a close look at the specific promises contained in the 1854 Treaty leaves us especially loathe to recognize the surrender-of-tax-immunity theory advocated by the State…. Had Congress enacted the text of the 1854 Treaty in the form of a statute, all the lands in question would be fully taxable under the reasoning of *Yakima*. In this sense the distinction the Supreme Court's cases have drawn here—between congressionally authorized alienability (which renders lands taxable) and alienation in fact (which does not)—might seem needlessly formalistic and leading to an odd practical result…. The State of Wisconsin and its localities seek to tax Ojibwe tribal members who own Ojibwe reservation lands. We hold that they may not do so.

*Id.*, at 557, 569, and 571 (emphasis added).

**C.**      **Federal lawsuit filed in the Western District of Oklahoma finding a federal preemption.**

Oklahoma filed a federal lawsuit requesting an injunction attacking the government's decision to strip Oklahoma of its regulatory authority over surface mining on the Creek Reservation in *Oklahoma v. United States Department of Interior, et. at.*, Case No. CIV-21-719-F. The Court faced an interpretation and application of a federal statute the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201, et seq. (SMCRA). For decades, Oklahoma has regulated surface coal mining and reclamation operations within its borders, including on land that was previously understood–for more than a hundred years–to lie within the former boundaries of disestablished Indian reservations. That understanding was upended when the Supreme Court ruled that the Creek Reservation in eastern Oklahoma had never been disestablished. *McGirt, supra.* Applying the same reasoning, the Oklahoma Court of Criminal Appeals subsequently recognized the continued existence of the Choctaw Reservation *Sizemore v. State*, 2021 OK CR 6, 485 P.3d 867 and the Cherokee Reservation. *Hogner v. State*, 2021 OK CR 4, 500 P.3d 629. On November 9, 2022, United States District Judge declared, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that:

> The Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201, *et seq.*, **preempts application** of Oklahoma state laws regulating surface coal mining and reclamation activities within the exterior boundaries of the Creek Reservation; and

> The Surface Mining Control and Reclamation Act and its implementing regulations designate the Office of Surface Mining Reclamation and Enforcement as the exclusive regulatory authority over surface coal mining and reclamation activities within the exterior boundaries of the Creek Reservation in the absence of an approved tribal regulatory program.

13

Doc. # 107

The preemptive effect of a federal law "may be either expressed or implied, and 'is compelled whether Congress's command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (citation omitted). The language used in 18 U.S.C § 1151 "notwithstanding the issuance of any patent…" is crucial to the inquiry here because the patent issued to the Cherokee Nation was the title to the land and the fact there was a land run in Oklahoma which caused patents to be issued to the homesteaders did nothing to affect the 1838 patent to Cherokee Nation and all lands remain Indian Country. The land runs were nothing more than allotments of land that could not change the status in the Reservation land.

When we look at the language used by Congress in Oklahoma's Enabling Act Oklahoma has **no** "interest," because that language was clear "[t]hat the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title, in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States…." *Id.*, § 3 at Third, 34 Stat., 270 (emphasis added) *See* Okla. Const. art. I § 3.[4]

---

[4] *See In re Initiative Petition No.* 363, 1996 OK 122, 927 P.2d 558, 563 & n. 12.

D.    **Oklahoma cannot assert sovereign authority as congressional intent is clear considering Oklahoma's own interpretation of Federal law.**

Oklahoma Supreme Court's interpretation of its Enabling Act in *Higgins v. Brown*, 1908 OK 28, ¶ 164, 94 P. 703, one of the most extensive analysis—one year after statehood—found, "[b]y the same process of reasoning followed by the Supreme Court of the United States in cases of *U.S. v. McBratney,* 104 U.S. 621 (1882), and *Draper v. U.S.,* 164 U.S. 240 (1896), we conclude that the Congress, upon the admission of Oklahoma as a State, where it has intended to except out of such state an Indian reservation, or **the sole and exclusive jurisdiction over that reservation, it has done so by express words.**" *Id.* Oklahoma's interpretation supports Plaintiff's claims of federal preemption. However, Oklahoma's view over the years has only been to vest itself with a right preempted by Federal law. Oklahoma, like many other states, was required to disclaim jurisdiction over Indians at statehood*. See* Enabling Act, ch. 3335, § 3, 34 Stat. 267, 270 (1906); Enabling Act Amendment, ch. 2911, 34 Stat. 1286 (1907).

E.    **The United States Supreme Court's interpretation of Oklahoma's Enabling Act.**

Oklahoma Enabling Act and interpreting it as a general reservation of federal and tribal jurisdiction over Indians and their lands and property. *Indian Country, U.S.A. v. Oklahoma Tax Com'n*, 829 F.2d 967 (10th Cir. 1987) *cert. denied*, 487 U.S. 1218 (1988). The Court rejected Oklahoma's position that its disclaimer was solely governmental stating

Oklahoma's disclaimer is one both of proprietary and of governmental authority[5]. *See Id.,* at 976-81. Neither the Oklahoma Supreme Court, nor the State in *Seneca-Cayuga Tribe v. State ex rel. Thompson*, 874 F.2d 709 (10th Cir. 1989) agreed with the Tenth Circuit's conclusion.

### F.     Primacy of Federal Interest

The Constitution afforded Congress authority to make war and negotiate treaties with the Tribes. See Art. I, § 8; Art. VI, cl. 2. It barred States from doing either of these things. See Art. I, § 10. And the Constitution granted Congress the power to "regulate Commerce ... with the Indian Tribes." Art. I, § 8, cl. 3. Nor did the Constitution replicate the Articles' carveout for state power over Tribes within their borders. Madison praised this change, contending that the new federal government would be "very properly unfettered" from this prior "limitatio[n]." The Federalist No. 42, at 268. Antifederalist Abraham Yates agreed (but bemoaned) that the Constitution "totally surrender[ed] into the hands of Congress the management and regulation of the Indian affairs." Letter to the Citizens of the State of New York (June 13-14, 1788), in 20 Documentary History of the Ratification of the Constitution 1153, 1158 (J. Kaminski et al. eds. 2004).

---

[5] Oklahoma Supreme Court has held in recent years that the Oklahoma disclaimer is one of proprietary, but not of governmental, authority. *See Currey v. Corporation Comm'n*, 1979 OK 89, 617 P.2d 177, 179-80, *cert. denied*, 452 U.S. 938 (1981) (disclaimer is one of proprietary interest in Indian lands), *see also Organized Village of Kake v. Egan*, 369 U.S. 60, 69 (1961) (construing Alaskan disclaimer as proprietary rather than governmental). The reasoning behind *Organized Village of Kake* was that Alaska was a public law 280 state. The Tenth Circuit held the Enabling Acts conferring statehood in Oklahoma are federal enactments. *Seneca-Cayuga Tribe v. State ex rel. Thompson*, 874 F.2d 709 (10th Cir. 1989)

### i. Oklahoma's Administrative Surface Mining Control and Reclamation is preempted by Federal law and Oklahoma Administrative Code.

Oklahoma is a primacy state that has an approved Title V state regulatory program. 47 Fed. Reg. 14,152 (April 2, 1982). Under the approved program, Oklahoma may monitor "coal exploration and surface coal mining and reclamation operations on non-Indian and non-Federal lands within Oklahoma." *Id.*; *see also* Okla. Admin. Code 460:20-3-5 (defining Oklahoma's "state program" to include "non-Indian and non-Federal lands within that State").

### ii. Medical Marijuana Licenses are preempted by Federal law and Oklahoma Administrative Code.

Next, even Oklahoma's medical marijuana licenses cannot apply within the Cherokee Nation, or any land held in trust by the United States. *See* Okla. Admin. Code 310:681-1-3 which states: "All medical marijuana licenses and rights granted under Oklahoma law and this Chapter shall only be valid in the State of Oklahoma, excluding any tribal trust or tribal restricted land or federal lands in the state…"

### iii. Oklahoma Tax Commission's rules preempt authority to impose taxes in Indian Country because that is derived from Federal Law and Oklahoma Administrative Code.

Okla. Admin. Code 710:50-15-2 a) Definitions. These words and terms, when used in this Section, shall have the following meaning, unless the context clearly indicates otherwise: (1) "Indian Country" means and includes formal and informal reservations, dependent Indian communities, and Indian allotments, the Indian titles to which have not been extinguished, whether restricted or held in trust by the United States. [*See*: 18 U.S.C.

17

§ 1151] (2) "Informal reservations" means and includes lands held in trust for a tribe by the United States and those portions of a tribe's original reservation which were neither allotted to individual Indians. Absent explicit congressional direction to the contrary, the Supreme Court presumes against a State's having the jurisdiction to tax within Indian Country, whether the particular territory consists of a formal or informal reservation, allotted lands, or dependent Indian communities. *Oklahoma Tax Comm'n v. Sac and Fox Nation,* 508 U.S. 114, 128 (1993)

In *Video Gaming Techs., Inc. v. Rogers Cnty. Bd. of Tax Roll Corr.,* 2019 OK 83, 475 P.3d 824, 834 the Oklahoma Supreme Court held that the "ad valorem taxation of gaming equipment here is preempted", *cert. denied*, *Rogers Cnty. Bd. of Tax Roll Corr. v. Video Gaming Techs*., 141 S.Ct. 24 (2020) (Justice THOMAS, dissenting from the denial of certiorari) In the dissent he recognizes the McGirt decision "profoundly destabilized the governance of eastern Oklahoma" and "create[d] significant uncertainty" about basic government functions like "taxation." *Id* at 24. [A]bsent cession of jurisdiction or other federal statutes permitting it... "a State is without power to tax reservation lands and reservation Indians." *County of Yakima v. Confederated Tribes and Bands of Yakima Nation*, 502 U.S. 251, 258 (1992) (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973)) (emphasis added, other alteration in original). Further, Oklahoma's position that the Supreme Court's decision in *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005) supported its position in *Oklahoma v. United States Department of Interior, et al.,* was rejected by finding that *Sherrill* did not compel a different result.

18

G.     *Oklahoma v. Castro-Huerta*, 142 S.Ct. 2486 (2022) does not vest
       Oklahoma with authority.

Next turning to what the Supreme Court held in *Oklahoma v. Castro-Huerta*, 142 S.Ct. 2486 (2022). Finding that [u]nder Court precedent, a State's jurisdiction in Indian Country may be preempted by federal law under ordinary principles of federal preemption, or when the exercise of state jurisdiction would unlawfully infringe on tribal self-government. *Castro-Huerta*, 142 S.Ct. at 2489. Plaintiff maintains there is clearly a federal preemption and because it unlawfully infringes on tribal self-governance.

*Castro-Huerta*, employed the "*Bracker*[6] balancing test." Where applying what has been referred to as the *Bracker* balancing test, this Court has recognized that even when federal law does not preempt state jurisdiction under ordinary preemption analysis, preemption may still occur if the exercise of state jurisdiction would unlawfully infringe upon tribal self-government. *See Bracker*, 448 U.S., at 142-143; *see also New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333-335 (1983). Under the *Bracker* test, the Court considers tribal interests, federal interests, and state interests. *Bracker*, 448 U.S., at 145.

Although in the case at bar, the 1866 Cherokee Nation treaty provides in part:

ARTICLE 5. The inhabitants electing to reside in the district described in the preceding article shall have the right to elect all their local officers and judges, and the number of delegates to which by their numbers they may be entitled in any general council to be established in the Indian Territory under the provisions of this treaty, as stated in Article XII, and to control all their local affairs, and to establish all necessary police regulations and rules for the administration of justice in said district, not inconsistent with the constitution of the Cherokee Nation or the laws of the United States; Provided, The Cherokees residing in said district shall enjoy all the rights and privileges of other Cherokees who may elect to settle in said district as

---

[6] *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980).

hereinbefore provided, and shall hold the same rights and privileges and be subject to the same liabilities as those who elect to settle in said district under the provisions of this treaty; Provided also, That if any such police regulations or rules be adopted which, in the opinion of the President, bear oppressively on any citizen of the nation, he may suspend the same. And all rules or regulations in said district, or in any other district of the nation, discriminating against the citizens of other districts, are prohibited, and shall be void.

Oklahoma is different because Congress was explicit that Oklahoma had to disclaim jurisdiction with Oklahoma's Enabling Act which provided "no repeal, express or implied," of treaty provisions. *Ex parte Webb*, 225 U.S. 663, 682 (1912).  In prefacing the seriousness and scope of the State's lack of sovereign authority, in the case of *Ware v. Hylton*, 3 U.S. 199 (1796), the United States Supreme Court was bound to strike down an invalid Virginia law as violating a treaty provision that the "Supremacy Clause" (U.S. Const., art. VI, cl. 2) made superior, whereby:

> If doubts could exist before the establishment of the present national government, they must be entirely removed by the 6th article of the Constitution, which provides "That all treaties made, or which shall be made, under the authority of the United States, shall be the Supreme law of the land; and the Judges in every State shall be bound thereby, anything in the Constitution, or laws, of any State to the contrary notwithstanding." There can be no limitation on the power of the people of the United States. By their authority the State Constitutions were made, and by their authority the Constitution of the United States was established; and they had the power to change or abolish the State Constitutions, or to make them yield to the general government, and to treaties made by then authority. **A treaty cannot be the Supreme law of the land**, that is **of all the United States, if any act of a State Legislature can stand in its way. If the Constitution of a State** (which is the fundamental law of the State, and paramount to its Legislature) **must give way to a treaty, and fall before it; can it be questioned, whether the less power, an act of the State Legislature, must not be prostrate? It is the declared will of the people of the United States that every treaty made, by the authority of the United States, shall be superior to the Constitution and laws of any individual State; and their will alone is to decide.** — If a law of a State, contrary to a treaty, is not void, but voidable

20

only by a repeal, or nullification by a State Legislature, this certain consequence follows, that the will of a small part of the United States may controul or defeat the will of the whole. **The people of America have been pleased to declare, that all treaties made before the** establishment of the National Constitution, or **laws of any of the States, contrary to a treaty, shall be disregarded.**

*Id*., at 236-237 (emphasis added).

At no point in *Castro-Huerta* were the Treaties considered, nor 25 U.S.C. § 71, with the Oklahoma Enabling Act because there is an expressed federal preemption. It is clear under *Bracker* that "federal law does [] preempt state jurisdiction under ordinary preemption analysis" and that "preemption [would] occur [given] the exercise of state jurisdiction would unlawfully infringe upon tribal self-government." *Id*. The statutes enacted for Oklahoma do not extend to Indian Country because only the legislative body of the tribes may regulate its own land.

Plaintiff argues that the facts alleged in this case clearly implicate the type of whimsical sovereign that due process was designed to guard against. "[F]ederal courts that are classed as "inferior" under Article III have the power to vacate only state court judgments that are considered **void *ab initio***. Sound jurisprudential reasons underlie this concept. Because a void judgment is null and without effect, the vacating of such a judgment is merely a formality and **does not intrude upon the notion of mutual respect in federal-state interests.**" *In re James*, 940 F.2d 46, 53 (3rd Cir. 1991); *See also Woodward v. U.S. Bank National Assoc.*, Bankruptcy No. 17-16163-MDC (Bankr. E.D. Pa. July 21, 2020) (footnote 60). The U.S. Supreme Court principally relies on the doctrine that "an [unlawful] act … is void and confers no right upon the wrongdoer." *Waskey v.*

21

*Hammer*, 223 U.S. 85, 94 (1912); *Miller v. Ammon*, 145 U.S. 421, 426 (1892); *Burck v.*

*Taylor*, 152 U.S. 634 (1894); *Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540, 548 (1902);

*See also Ewert v. Bluejacket*, 259 U.S. 129, 138 (1922)).

> **H.   An analysis under *Heck v. Humphrey* supports that Plaintiff's claims cannot be barred.**

The question presented to the Supreme Court in *Heck v. Humphrey*, 512 U.S. 477,

478 (1994), was whether "a state prisoner may challenge the constitutionality of his

conviction in a suit for damages under 42 U.S.C. § 1983." All nine justices agreed that the

issue required the Court to reconcile two acts of Congress, § 1983 and the federal habeas

corpus statute: "[T]his case lies at the intersection of the two most fertile sources of federal-

court prisoner litigation—the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42

U.S.C. § 1983, and the federal habeas corpus statute, 28 U.S.C. § 2254." *Id.* at 480, (Souter,

J., concurring in judgment); *Id.* at 490 (Thomas, J., concurring).

In reconciling § 1983 and the federal habeas statute, *Heck* confronted the issue of §

1983 claims brought "to recover damages for allegedly unconstitutional conviction or

imprisonment, or for other harm caused by actions whose unlawfulness would render a

conviction or sentence invalid." *Id.* at 486. In a § 1983 action Plaintiff must "prove that the

conviction or sentence has been reversed on direct appeal, expunged by executive order,

declared invalid by a state tribunal authorized to make such determination, or **called into**

**question by a federal court's issuance of a writ of habeas corpus.**" *Id.* at 486-87.

Plaintiff argues that *Heck* cannot bar relief because any judgment he is under is void *ab initio* as determined in *Murphy v. Royal,* 866 F.3d 1164 (10th Cir. 2017)[7]. The Tenth Circuit held "Mr. Murphy's state conviction and death sentence are thus invalid. We therefore reverse the district court's judgment and remand with instructions to grant Mr. Murphy's application for a writ of habeas corpus." Therefore, a conviction can be called into question by a federal court's issuance of a writ of habeas corpus and *Heck* cannot bar those claims.

### Standards for Granting Preliminary Injunctions

A preliminary injunction is "the exception rather than the rule." *United States ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888 (10th Cir. 1989). Because it is "an extraordinary remedy, the right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp*., 356 F.3d 1256, 1261 (10th Cir. 2004) (internal quotation marks and citation omitted). To obtain a preliminary injunction, the movant bears the burden of establishing four factors: "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest." *Republican Party of New Mexico v. King,* 741 F.3d 1089, 1092 (10th Cir. 2013). Where a movant fails to

---

[7] *Murphy v. Royal*, 866 F.3d 1164 (10th Cir. 2017) as modified recognized that (in 1897, Congress imposed several measures to force the Creek Nation's agreement to the allotment policy. Congress (1) "provid[ed] that the body of federal law in Indian Territory, which included the incorporated Arkansas laws, **was to apply irrespective of race.**")

establish a likelihood of success on the merits, it is unnecessary to address the remaining requirements for a preliminary injunction. *Warner v. Gross,* 776 F.3d 721, 736 (10th Cir. 2015). Plaintiff states that the likelihood of success on the merits is greater than not.

In *SCFC ILC, Inc. v. Visa USA*, Inc., 936 F.2d 1096, 1098-99 (10th Cir. 1991), the Tenth Circuit identified these three types of specifically disfavored preliminary injunctions and concluded that a movant must "satisfy an even heavier burden of showing that the four [preliminary injunction] factors . . . weigh heavily and compellingly in movant's favor before such an injunction may be issued": (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief it could recover at the conclusion of a full trial on the merits. The en banc court holds that courts in this Circuit must recognize that any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support granting a remedy that is extraordinary even in the normal course. *O Centro Espirita Beneficiente v. Ashcroft*, 389 F.3d 973, 1012 (10th Cir. 2004).

"The Supreme Court has stated that preliminary injunctions have the "limited purpose" of "merely [preserving] the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)." *O Centro Espirita Beneficiente v. Ashcroft*, 389 F.3d 973, 1012 (10th Cir. 2004) "The burden of justifying preliminary relief is higher if it would disturb the status quo. *SCFC ILC, Inc.*, 936 F.2d at 1098-99." *Id.*

## II.    EXHAUSTION OF REMEDIES.

The exhaustion doctrine is inapplicable to the Plaintiff's claims because Defendant has vested itself with a right preempted by federal law and there is no other court of competent jurisdiction to resolve the issue.

## RELIEF SOUGHT

1.    Plaintiff seeks declaratory judgment.
2.    Plaintiff seeks injunctive relief requiring the Defendant to release him from confinement as his judgment is void ab initio.
3.    Plaintiff seeks to prohibit all enforcement of Oklahoma statutes on reservation lands and especially in this case the Cherokee Reservation.
4.    Plaintiff seeks all relief that is equitable and just.

Respectfully submitted,

/s/ DEBRA K. HAMPTON
DEBRA K. HAMPTON, OBA # 13621
Hampton Law Office, PLLC
3126 S. Blvd., # 304
Edmond, OK 73013
(405) 250-0966
(866) 251-4898 (fax)
hamptonlaw@cox.net
Attorney for Plaintiff